Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 2957 | **DATE** | 3/26/2001 |
| **CASE TITLE** | Nevel vs. Village of Schaumburg | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. For the reasons set forth on the attached order, defendants' motion for summary judgment as to Count 3 [36-1] is granted. Defendants' motion to strike the affidavit of Ronald Rood [72-1] is denied as moot. Plaintiffs' motion to defer ruling on summary judgment [59-2] was previously granted and is therefore terminated. The Clerk is directed to enter judgment in favor of defendants on Counts 1 and 3 of plaintiffs' complaint, and dismissing Count 2 pursuant to 28 U.S.C. §1367(c)(3) for lack of subject matter jurisdiction. The ruling date of March 27, 2001 is vacated.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | MAR 27 200 | |
| | Notified counsel by telephone. | | date docketed | 11 |
| ✓ | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | FILED FOR DOCKETING | | |
| | Copy to judge/magistrate judge. | 01 MAR 26 PM 4:10 | date mailed notice | |
| OR | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MARTY NEVEL and LAURA NEVEL, )
)
Plaintiffs, )
)
vs. ) Case No. 00 C 2957
)
VILLAGE OF SCHAUMBURG, et al., )
)
Defendants. )

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Plaintiffs Marty and Laura Nevel claim that the Village of Schaumburg and several of its officials violated their constitutional right to equal protection of the laws in connection with the Nevels' efforts to put vinyl siding on their home, a designated historic landmark in Schaumburg. For the reasons that follow, the Court concludes that the Nevels cannot establish an equal protection claim.

## FACTS

Because defendants have moved for summary judgment, we take the facts in the light most favorable to the Nevels, drawing reasonable inferences in their favor. *E.g., Popovits v. Circuit City Stores, Inc.*, 185 F.3d 726, 731 (7th Cir. 1999).

In March 1999, Marty Nevel purchased at an auction a large home in Schaumburg called the Kern-Schmidt mansion. The home was built in 1930 and had been designated as a historic landmark by the Schaumburg Village Board in December 1997. It is undisputed that the property's landmark designation had been properly recorded with the Cook County Recorder of

Deeds. Nevel's title insurer, however, did not pick this up in its investigation prior to issuing a title insurance policy commitment to the Nevels, and plaintiffs say they were unaware of the landmark designation at the time they purchased the property.[1]

The Kern-Schmidt mansion had wood siding when the Nevels bought it. In April 1999, Marty Nevel advised Village Senior Planner Timothy Teddy that he was considering covering the exterior with a material called "dryvit" (a form of stucco) in order to eliminate a lead paint hazard. Teddy recommended against this and, according to Nevel, suggested that the Nevels use aluminum or vinyl siding. Nevel says that Teddy advised him to obtain building permits from the Village when he was ready and said nothing about a landmark designation. (Teddy contradicts this; he says he told Nevel that the building was a designated landmark and that Nevel's plans had to be reviewed and approved by the Olde Schaumburg Centre Commission (OSCC). But in the present context we are required to take the evidence in the light most favorable to the Nevels.)

The Nevels investigated and determined that it would cost them $157,000 to install vinyl siding on the home, as compared with $250,000 to replace the existing siding with new wood. The Nevels determined to use vinyl siding and hired a company called Nu-Concepts to perform the necessary work. In anticipation of installing the siding, the Nevels spent over $125,000 for materials, and Nu-Concepts began to do preparatory work, such as milling and installing windows and hanging insulation. At this point, the Nevels had not obtained a building permit for installation of the siding.

---

[1] The Court has not been advised whether the Nevels have taken any action against the title insurer.

2

In late August 1999, Marty Nevel says, he had another conversation with Teddy and told him that he planned to install vinyl siding; he says that Teddy told him to apply to the Village's Building Department for permits and that the Nevels' plans would be reviewed there. According to Nevel, Teddy again said nothing about the landmark designation or any special requirements that might exist. (Again, Teddy contradicts this.)

On September 16, 1999, Marty Nevel had a conversation with Village Planner Frank Robbins. Robbins advised Nevel of the landmark designation; Nevel says this is the first time he heard of it. Robbins told Nevel that the installation of vinyl siding would require approval by the OSCC and that Nevel would be required to appear before the OSCC to seek approval. That same day, Nevel sent Robbins a letter requesting OSCC approval for installation of the vinyl siding. The letter referred to the lead paint hazard and described in detail the work that the Nevels proposed to do.

Despite the Nevels' request for OSCC approval, the next day, September 17, 1999, Nu-Concepts applied for and obtained from the Village a building permit to install vinyl siding. According to Marty Nevel, he had not advised Nu-Concepts of his contacts with Robbins or the requirement of OSCC approval, and he was unaware of Nu-Concepts' permit application. The building permit was issued by Kathleen Witkowski, a secretary for Building and Code Enforcement who was working the desk that day. She followed normal procedure, checking only to determine whether Nu-Concepts was licensed and bonded; she was unaware that the property was designated as a landmark.

Sometime between September 17 and October 1, Nu-Concepts began to install the vinyl siding. It is not clear from the record when the Nevels learned that work had started. About two

3

or three weeks after the installation began, Marty Nevel advised Nu-Concepts that there was going to be a hearing before the OSCC to determine what, if any, requirements existed concerning the exterior of the property. Despite the fact that he had been told that OSCC approval was required, however, Nevel did not tell Nu-Concepts to stop work pending approval.

On October 3, 1999, Robbins sent Nevel a letter advising him that the Nevels' request would be considered at the OSCC's meeting on October 21, 1999. In the letter, Robbins stated that OSCC staff would recommend denial of the request to use vinyl siding, because "preservation authorities generally concur that vinyl siding should not be applied to landmark buildings."

On October 14, 1999, Senior Planner Teddy issued a report recommending denial of the Nevels' request to install vinyl siding, as well as their request to revoke the property's landmark designation (it is unclear when the latter request was made). In the report, Teddy stated that the OSCC staff's recommendation against vinyl siding was supported by an August 1998 bulletin from the Illinois Historic Preservation Agency stating that "[i]nstalling artificial siding over historic siding does not meet the Standards on primary or visible secondary facades -- those facades that can be viewed by the public or have formal detailing and significance." The Nevels note that Teddy's report did not mention the lead paint hazard on the property or that an OSCC design manual containing criteria for renovating structures in the Olde Schaumburg Centre District[2] states that "[i]f it is unfeasible to retain original wood on walls, 4" seamless aluminum or vinyl siding may be used."

---

[2] The Kern-Schmidt mansion is not part of the Olde Schaumburg Centre District.

On October 27, 1999, at Hornstrom's direction, an employee of the Building Department posted a "stop work order" on the property, though the Department did not revoke the previously-issued building permit. By this time, Nu-Concepts had already installed vinyl siding on a portion of the home.

Marty Nevel was unable to attend the October 1999 meeting of the OSCC, so a November meeting was arranged for his benefit and his request for approval of the vinyl siding was reset to that meeting. The meeting took place on November 4, 1999. At the meeting, Robbins recommended denial of the Nevels' request, stating that the position of the United States Department of Interior and the Illinois Historic Preservation Agency was that vinyl siding should not be used in this type of situation. The Nevels point out that Robbins did not mention the OSCC design manual provision quoted earlier, and likewise did not mention the fact that an IHPA bulletin indicates that "a compatible substitute material may be considered" if it is economically unfeasible to use the same material used in the original siding. The OSCC voted unanimously to recommend denial of the Nevels' request for permission to install vinyl siding.

The Nevels contend that "hostility" toward them was displayed at the meeting. Their primary example of this is that the OSCC's chairman accused them of knowing, from materials provided to them at the auction for the Kern-Schmidt mansion, that the property was a designated landmark. (The materials referred to the property as an "historic mansion" but did not mention its landmark status.) In addition, the Nevels say, Hornstrom advised the OSCC at the meeting that his department had issued the building permit in error – which the Nevels allege was untrue.

On November 9, 1999, the Village's Board of Trustees voted 4-3 to deny the Nevels' request for permission to install vinyl siding. Again, the Nevels contend that they encountered

5

hostility at the meeting, specifically in a trustee's statement that Marty Nevel "knew what he was getting into" when he purchased the property and had been "trying to do what [they] could and get done before [they] got caught." Another trustee who voted against approval referred to Nevel's September 16, 1999 letter to Hornstrom, saying that it indicated that Nevel "was aware of the situation and just assumed that approval would be forthcoming."

Despite the Board's denial of their request for permission to install siding, the Nevels directed Nu-Concepts to resume installation. They did so after consulting with an attorney regarding what they believed to be their rights under the previously-issued building permit. Installation continued through December 20, 1999, and about 85% of the work was completed. On that date, the Building Department posted another stop work order and served Marty Nevel and Nu-Concepts with citations (quasi-criminal charges) for failing to obey a stop work order. Hornstrom sent Marty Nevel a letter noting that the building permit issued on September 17 had included as a condition "that all construction be done according to the codes of the Village of Schaumburg" and that Village ordinances required specific authorization of changes to a historic landmark. The letter stated that because the earlier stop work order had been ignored, Hornstrom had placed the matter with the Village Attorney to seek an injunction against further work. That same day, the Village Police ordered Nu-Concepts's personnel to leave the property or face arrest on unspecified charges, and the Village summarily suspended Nu-Concepts' business license. The Village thereafter had police patrol the area with instructions to inspect the property periodically and arrest anyone working on the vinyl siding.[3]

---

[3] In addition, there is evidence in the record from which a fact finder could infer that
(continued...)

6

On January 4, 2000, the Building Department served Marty Nevel with additional citations for making a non-conforming alteration to an historic landmark and for performing work without a building permit. Trial on all the citations was held before a Cook County Circuit Judge beginning on February 10, 2000. After two days of trial, the judge made a directed finding against the Village at the close of its case in chief. In the course of his ruling, the judge stated that no evidence had been presented concerning any misrepresentations in obtaining the building permit and that under the law, the Village was required to revoke the permit before attempting to enforce a stop work order.

The following day, Hornstrom sent the Nevels a letter purporting to revoke the permit, stating that "there has been a misrepresentation as to material fact in the implication [sic] of the plans and for other related Ordinances on which the Permit is based." Specifically, Hornstrom said, he was revoking the permit based on the Nevels' violation of Village ordinances requiring approval of any changes to a historic landmark. In late February and early March, various Village officials made comments to the press along the lines that the issue was not really about siding any more, but rather the Nevels' purported defiance of the law and the Village Board.

In late March 2000, the Village refused to replace a broken water meter on the property or to issue a permit for installation of a burglar alarm, until the Nevels signed an acknowledgment stating that "[t]he issuance of this permit does not in any way waive the requirement that all exterior work conform to the prior decision of the Village Board with respect to the use of vinyl

---

[3](...continued)
Hornstrom, the Trustees, and other Village officials were angry with the Nevels for installing vinyl siding before obtaining OSCC and Village approval and for continuing work after permission was denied.

7

siding and stucco."

In 1990, the Village had covered with aluminum siding the exterior of a municipal property known as "The Barn," a designated historic landmark outside the Olde Schaumburg Centre District which at the time had wood siding which could not be repaired. The decision to replace the wood siding with aluminum siding was made for reasons of maintenance and durability. In October 1999, while the Nevels' request was pending before the OSCC, Robbins was advised of the Village's prior actions concerning The Barn by Bob Miller, the Village's Director of Public Works.

The Nevels have also obtained an affidavit from Jo Ann Carroll, the owner of a home located in the Olde Schaumburg Centre District, who states that in 1982, "after obtaining a building permit in fall 1981 authorizing installation of vinyl siding on the exterior of our residence," her late husband and a contractor installed vinyl siding on the home, which prior to that time was covered with wood siding. She states that the Village did not require them to obtain permission from the OSCC or the Village Board, and that they were never asked to remove the siding. The Nevels have not submitted a copy of the purported building permit. The Village responds that its records reflect that no such building permit was issued; rather the only permits issued for the Carrolls' home concerned roof repair and remodeling of a kitchen and bathroom. It appears to be undisputed that unlike the Kern-Schmidt mansion, the Carroll home was not a designated historic landmark.

## PROCEDURAL BACKGROUND

Instead of filing suit in state court to challenge the Village's denial of their request to install vinyl siding or its revocation of the building permit obtained by Nu-Concepts, the Nevels

8

elected to bring a federal claim for denial of equal protection, as well as two supplemental state law claims. They first filed a motion for summary judgment on one of their state law claims, in which they had alleged that the designation of the property as a landmark in 1997 was invalid under state law because it was done without the proper notice to the then-owner. On October 10, 2000, the Court denied the Nevels' motion and indicated that in light of the Court's reading of the applicable Illinois law, defendants might well be entitled to summary judgment on that claim. Defendants later so moved, and the Court entered summary judgment against the Nevels on that claim.

The Village has moved for summary judgment on Count 3, the Nevels' equal protection claim. On November 17, 2000, the Court, in comments delivered from the bench, expressed doubt regarding the Nevels' ability to sustain a federal claim but ruled that consideration of the Village's motion would be deferred because the Nevels required further discovery, specifically the deposition of Hornstrom. The Nevels later completed that deposition and have submitted the transcript as well as additional materials in opposition to summary judgment.

## DISCUSSION

The Nevels do not claim that they were discriminated against due to their membership in a historically mistreated class. However, the Supreme Court has held that an equal protection claim may be brought by a person who is a member of a "'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 1073, 120 S.Ct. 1073, 1074 (2000) (per curiam). *See also Hilton v. City of Wheeling*, 209 F.3d 1005, 1007 (7th Cir. 2000).

9

A plaintiff claiming an equal protection violation in a "class of one" case must establish two distinct elements. First, the plaintiff must show that he was singled out for differential treatment, *Olech*, 120 S.Ct. at 1074; this is implicit in the notion of "equal" protection. The differential treatment can consist of being treated worse than others who were similarly situated; being treated the same as or worse than others who are situated worse than the plaintiff; or being treated differently than some established norm. *See generally Esmail v. Macrane*, 53 F.3d 176, 179 (7th Cir. 1995). Second, the plaintiff must show that the differential treatment was irrational or arbitrary, *see Olech*, 120 S.Ct. at 1074, or (at least in this Circuit) that the defendant was motivated by ill will or animus toward the plaintiff that is unrelated to a legitimate public purpose. *Hilton*, 209 F.3d at 1008; *Forseth v. Village of Sussex*, 199 F.3d 363, 371 (7th Cir. 2000). In this case, the Nevels challenge on equal protection grounds the denial of their request to install vinyl siding; the Village's issuance of a stop work permit without revoking the previously-issued building permit; its revocation of the building permit following the state court's finding against the Village on the citations; and the Village's subsequent non-issuance of a permit for a burglar alarm and refusal to install a new water meter.

With regard to the Village's denial of their request to install vinyl siding, the Nevels say that a jury issue regarding the requisite differential treatment is established by the Village's actions with regard to The Barn and the Carroll home. The Court disagrees with regard to the Carroll home. That property was never a historic landmark; there is no record indicating that the Village actually issued a permit for use of vinyl siding on the property; and even if it did so, the decision came eighteen years before the Nevels bought the Kern-Schmidt mansion. For these reasons, the Court concludes as a matter of law that the two situations cannot be considered

10

similar such that differential treatment might establish an equal protection violation.

The issue is perhaps somewhat closer with regard to The Barn. The decision to replace The Barn's wood siding with aluminum siding was made a full ten years before the decision not to permit the Nevels to use vinyl siding on their home, and the Barn is a non-residential property on a two and one-half acre plot used by a municipality, whereas the Nevels' home is a residential property in the middle of a residential neighborhood. These facts tend to indicate that the two matters were not "similarly situated" for purposes of the equal protection analysis. On the other hand, both The Barn and the Kern-Schmidt mansion were designated historic landmarks outside the Olde Schaumburg Centre District, and both properties had similar problems that prompted the desire to replace the original wood siding with artificial siding.

These conflicting considerations might be enough to give rise to a genuine issue of fact on the question of differential treatment. But even if so, the Village is entitled to summary judgment, for the Nevels have failed to produce evidence from which a reasonable jury could conclude that any differential treatment was either irrational or arbitrary, or prompted by ill will or animus unrelated to a legitimate public purpose. The evidence demonstrates beyond dispute that the Village made a reasoned decision in denying the Nevels' request to use vinyl siding. Though the outcome was one as to which reasonable minds could differ, the decision was the very antithesis of arbitrariness or irrationality. And though Village officials were critical of the Nevels, the issue is not whether the matter generated strong feelings – the equal protection clause does not require public officials to be entirely emotionless – but whether the decision was prompted by "reasons of a personal nature unrelated to the duties of the defendant's position." *Hilton*, 209 F.3d at 1008. Here there is no evidence that this was the case. Whatever ill will

11

existed stemmed from Village officials' perception that the Nevels had tried to pull a fast one and bypass the OSCC: Marty Nevel had requested the OSCC's approval on September 16, seemingly acknowledging in his letter to Hornstrom that approval was needed, but then his contractor had obtained a permit the very next day and started work before the OSCC had time to act. Though the Nevels say they were unaware of Nu-Concepts' activities, Village officials did not see it that way. The ill will, if there was any, was undeniably related to the defendants' legitimate duties and responsibilities in upholding the Village's rules and regulations concerning alteration of historic landmarks.

As for the issuance of the stop work order and the later revocation of the building permit, the Nevels have not provided the necessary predicate to transmogrify these arguable state law violations into a denial of equal protection. Again, though the Nevels say they were unaware that Nu-Concepts had applied for the building permit, the Village did not know that; it was faced with a situation which on the face of things made it appear that the Nevels had decided to make an end-run around the OSCC. The Nevels have not provided any evidence of any similar or comparable situations in which the Village acted differently. In any event, the revocation of a building permit appears to be fairly easily done – the Village did it in the blink of an eye following the not guilty finding on the citations – and under the circumstances we have a hard time seeing how the Village's failure to take such a ministerial step before issuing the stop work order could be considered a denial of equal protection of the laws (as contrasted with a mere violation of state law) in the unique situation that presented itself. And the Nevels have not explained how the later revocation of the building permit could constitute a denial of equal protection. The Nevels' claim that an unknowing clerk's issuance of the building permit locked

in their right to put up the vinyl siding might be viable as a matter of state law, but nothing in the equal protection clause precluded the Village from attempting to undo its apparent misstep in issuing the permit.

Finally, the Nevels attack the Village's insistence on an acknowledgment that any further permits sought by the Nevels would not be construed as altering the Village's ruling against the vinyl siding. Under the circumstances – particularly the Nevels' claim that once the earlier permit was issued, the Village was stuck with it – no jury could find that this requirement was in any way arbitrary or irrational, let alone that it harmed the Nevels in any way.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment as to Count 3 [36-1] is granted. Defendants' motion to strike the affidavit of Ronald Rood [72-1] is denied as moot. Plaintiffs' motion to defer ruling on summary judgment [59-2] was previously granted and is therefore terminated. The Clerk is directed to enter judgment in favor of defendants on Counts 1 and 3 of plaintiffs' complaint, and dismissing Count 2 pursuant to 28 U.S.C. §1367(c)(3) for lack of subject matter jurisdiction. The ruling date of March 27, 2001 is vacated.

MATTHEW F. KENNELLY
United States District Judge

Date: March 26, 2001

13